# EXHIBIT A

# Deed of Trust Note



$12,375,000.00

August 27, 2019
Effective August 28, 2019

      **FOR VALUE RECEIVED, RM63 HOLDINGS, LLC**, a Delaware limited liability company ("**Borrower**") with an address at 3949 Forest Parkway Suite 100, Wheatfield, New York 14120, promises to pay to the order of **PNC BANK, NATIONAL ASSOCIATION**, a national banking association ("**Bank**"), in lawful money of the United States of America in immediately available funds at its offices located at The Tower at PNC Plaza, 300 Fifth Avenue, PT-PTWR-15-1, Pittsburgh, Pennsylvania 15222, or at such other location as Bank may designate from time to time, the principal sum of **TWELVE MILLION THREE HUNDRED SEVENTY FIVE THOUSAND AND 00/100 DOLLARS ($12,375,000.00)**, or so much thereof as shall have been advanced (the "**Loan**") under that certain Construction and Mini Perm Loan Agreement, having an effective date of August 28, 2019, by and between Borrower and Bank (as the same may be amended, modified or renewed from time to time, "**Loan Agreement**") together with interest accruing from the date of initial advance on the outstanding principal balance hereof, as provided below:

**1.**      **Rate of Interest.** Amounts outstanding under this Note will bear interest at a rate or rates per annum as may be selected by Borrower from the interest rate options set forth below (each, an "**Option**"):

      **(a)**      **Base Rate Option.** The "**Base Rate Option**" shall mean a rate of interest per annum which is at all times equal to (A) the Base Rate plus (B) one hundred fifty basis points (1.50%); provided, however, that upon the Project (as defined in the Loan Agreement) achieving Project Stabilization (as defined in the Loan Agreement), the Base Rate Option shall mean a rate of interest per annum which is at all times equal to (A) Base Rate plus (B) one hundred twenty-five (125) basis points (1.25%). If and when the Base Rate (or any component thereof) changes, the rate of interest with respect to any amounts to which the Base Rate Option applies will change automatically without notice to Borrower, effective on the date of any such change. There are no required minimum interest periods for amounts bearing interest under the Base Rate Option.

      **(b)**      **LIBOR Option.** The "**LIBOR Option**" shall mean a rate of interest per annum which is at all times equal to (A) LIBOR plus (B) two hundred fifty (250) basis points (2.50%); provided, however, that upon Project Stabilization, the LIBOR Option shall mean a rate of interest per annum which is at all times equal to (A) LIBOR plus (B) two hundred twenty five (225) basis points (2.25%).

For purposes hereof; the following terms shall have the meanings set forth below. Capitalized terms not defined herein shall have the meaning ascribed to such terms in the Loan Agreement:

      "**Base Rate**" shall mean the highest of (A) the Prime Rate, and (B) the sum of the Overnight Bank Funding Rate plus fifty (50) basis points (0.50%), and (C) the sum of the Daily LIBOR Rate plus one hundred (100) basis points (1.00%), so long as a Daily LIBOR Rate is offered, ascertainable and not unlawful.

      "**Business Day**" shall mean any day other than a Saturday or Sunday or a legal holiday on which commercial banks are authorized or required by law to be closed for business in Pittsburgh, Pennsylvania.

      "**Daily LIBOR Rate**" shall mean, for any day, the rate per annum determined by Bank by dividing (x) the Published Rate by (y) a number equal to 1.00 minus the LIBOR Reserve Percentage; provided,

{00618809.9}

however, if the Daily LIBOR Rate determined as provided above would be less than zero, then such rate shall be deemed to be zero.

"**LIBOR**" shall mean, with respect to any amount to which the LIBOR Option applies for the applicable LIBOR Interest Period, the interest rate per annum determined by Bank by dividing (the resulting quotient rounded upwards, at Bank's discretion, to the nearest 1/100th of 1%) (i) the rate of interest determined by Bank in accordance with its usual procedures (which determination shall be conclusive absent manifest error) to be the eurodollar rate two (2) Business Days prior to the first day of such LIBOR Interest Period for such amount and having a borrowing date and a maturity comparable to such LIBOR Interest Period by (ii) a number equal to 1.00 minus the LIBOR Reserve Percentage; provided, however, if LIBOR, determined as provided above, would be less than zero, then LIBOR shall be deemed to be zero.

"**LIBOR Interest Period**" shall mean, with respect to any amount to which the LIBOR Option applies, the period of one (1) month or less as selected by Borrower on the date of disbursement of such amount (or the date of conversion of any amount to the LIBOR Option, as the case may be) and each successive period selected by Borrower thereafter; provided that, (i) if a LIBOR Interest Period would end on a day which is not a Business Day, it shall end on the next succeeding Business Day unless such day falls in the next succeeding calendar month in which case the LIBOR Interest Period shall end on the next preceding Business Day, (ii) Borrower may not select a LIBOR Interest Period that would end on a day after the Maturity Date (as hereinafter defined), and (iii) any LIBOR Interest Period that begins on the last Business Day of a calendar month (or a day for which there is no numerically corresponding day in the last calendar month of such LIBOR Interest Period) shall end on the last Business Day of the last calendar month of such LIBOR Interest Period.

"**LIBOR Reserve Percentage**" shall mean the maximum effective percentage in effect on such day as prescribed by the Board of Governors of the Federal Reserve System (or any successor) for determining the reserve requirements (including, without limitation, supplemental, marginal and emergency reserve requirements) with respect to eurocurrency funding (currently referred to as "**Eurocurrency liabilities**").

"**Overnight Bank Funding Rate**" shall mean, for any day, the rate comprised of both overnight federal funds and overnight Eurocurrency borrowings by U.S.-managed banking offices of depository institutions, as such composite rate shall be determined by the Federal Reserve Bank of New York ("**NYFRB**"), as set forth on its public website from time to time, and as published on the next succeeding Business Day as the overnight bank funding rate by the NYFRB (or by such other recognized electronic source (such as Bloomberg) selected by Bank for the purpose of displaying such rate); provided, that if such day is not a Business Day, the Overnight Bank Funding Rate for such day shall be such rate on the immediately preceding Business Day; provided, further, that if such rate shall at any time, for any reason, no longer exist, a comparable replacement rate determined by Bank at such time (which determination shall be conclusive absent manifest error). If the Overnight Bank Funding Rate determined as above would be less than zero, then such rate shall be deemed to be zero. The rate of interest charged shall be adjusted as of each Business Day based on changes in the Overnight Bank Funding Rate without notice to Borrower.

"**Prime Rate**" shall mean the rate publicly announced by Bank from time to time as its prime rate. The Prime Rate is determined from time to time by Bank as a means of pricing some loans to its borrowers. The Prime Rate is not tied to any external rate of interest or index, and does not necessarily reflect the lowest rate of interest actually charged by Bank to any particular class or category of customers.

"**Published Rate**" shall mean the rate of interest published each Business Day in the Wall Street Journal "Money Rates" listing under the caption "London Interbank Offered Rates" for a one month period

{00618809.9}                                                    - 2 -

(or, if no such rate is published therein for any reason, then the Published Rate shall be the eurodollar rate for a one month period as published in another publication selected by Bank).

LIBOR and the Daily LIBOR Rate shall be adjusted with respect to any amounts to which the LIBOR Option or Base Rate Option applies, as applicable, on and as of the effective date of any change in the LIBOR Reserve Percentage. Bank shall give prompt notice to Borrower of LIBOR or the Daily LIBOR Rate as determined or adjusted in accordance herewith, which determination shall be conclusive absent manifest error.

If Bank determines (which determination shall be final and conclusive) that, by reason of circumstances affecting the eurodollar market generally, deposits in dollars (in the applicable amounts) are not being offered to banks in the eurodollar market for the selected term, or adequate means do not exist for ascertaining LIBOR, then Bank shall give notice thereof to Borrower. Thereafter, until Bank notifies Borrower that the circumstances giving rise to such suspension no longer exist, (a) the availability of the LIBOR Option shall be suspended, and (b) the interest rate for all amounts then bearing interest under the LIBOR Option shall be converted at the expiration of the then current LIBOR Interest Period(s) to the Base Rate Option.

In addition, if, after the date of this Note, Bank shall determine (which determination shall be final and conclusive) that any enactment, promulgation or adoption of or any change in any applicable law, rule or regulation, or any change in the interpretation or administration thereof by a governmental authority, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by Bank with any guideline, request or directive (whether or not having the force of law) of any such authority, central bank or comparable agency shall make it unlawful or impossible for Bank to make or maintain or fund loans based on LIBOR, Bank shall notify Borrower. Upon receipt of such notice, until Bank notifies Borrower that the circumstances giving rise to such determination no longer apply, (a) the availability of the LIBOR Option shall be suspended, and (b) the interest rate on all amounts then bearing interest under the LIBOR Option shall be converted to the Base Rate Option either (i) on the last day of the then current LIBOR Interest Period(s) if Bank may lawfully continue to maintain or fund loans based on LIBOR to such day, or (ii) immediately if Bank may not lawfully continue to maintain or fund loans based on LIBOR.

2. **Interest Rate Election.** Subject to the terms and conditions of this Note, at the end of each interest period applicable to any amounts hereunder, Borrower may renew the Option applicable to such amounts or convert such amounts to a different Option; provided that, during any period in which any Event of Default (as hereinafter defined) has occurred and is continuing, any amounts bearing interest under the LIBOR Option shall, at Bank's sole discretion, be converted at the end of the applicable LIBOR Interest Period to the Base Rate Option, and the LIBOR Option will not be available to Borrower with respect to the conversion or renewal of any other amounts until such Event of Default has been cured by Borrower or waived by Bank. Borrower shall notify Bank of each election of an Option, each conversion from one Option to another, the amount of the portions hereunder to be allocated to each Option and where relevant the interest periods therefor. In the case of converting to the LIBOR Option, such notice shall be given at least three (3) Business Days prior to the commencement of any LIBOR Interest Period. If no interest period is specified in any such notice for an amount that is to bear interest under the LIBOR Option, Borrower shall be deemed to have selected a LIBOR Interest Period of one month's duration. If no notice of election, conversion or renewal is timely received by Bank with respect to any amount hereunder, Borrower shall be deemed to have elected the LIBOR Option. Any such election shall be promptly confirmed in writing by such method as Bank may require.

3. **Payment of Interest**. Subject to possible adjustment per the terms of Section 4(e) hereof, Borrower shall pay accrued interest on the unpaid principal balance of this Note in arrears commencing on September

{00618809.9}                                                  - 3 -

1, 2019 and on the first day of each calendar month thereafter until the Maturity Date, as the same may be extended.

4. **Maturity Date; Payment of Principal; Mini Perm Loan and Mini Perm Loan Extension Options.**

(a) Any outstanding principal and accrued interest shall be due and payable in full on August 28, 2022, unless accelerated upon an Event of Default at an earlier date (the "**Maturity Date**"), or unless extended pursuant to the Mini Perm Loan Option or the Mini Perm Loan Extension Option (each defined below).

(b) If any payment under this Note shall become due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall be included in computing interest in connection with such payment. Borrower hereby authorizes Bank to charge Borrower's deposit account at Bank for any payment when due hereunder after providing Borrower with two (2) business day's prior written notice thereof unless the same is from the interest reserve account, in which case notice shall not be required. Payments received will be applied to charges, fees and expenses (including attorneys' fees), accrued interest and principal in any order Bank may choose, in its sole discretion.

(c) Borrower shall have (i) the option (the "**Mini Perm Loan Option**") at any time during the Construction Loan Period to convert the Construction Loan (as defined in the Loan Agreement) to a mini permanent loan (the "**Mini Perm Loan**") for a term of twelve (12) months, commencing on the date that immediately follows the last day of the Construction Loan Period (as defined in the Loan Agreement) (the "**Mini Perm Loan Period Commencement Date**") (the above-described period is herein called the "**Mini Perm Loan Period**") and (ii) the option (the "**Mini Perm Loan Extension Option**") to extend the Mini Perm Loan Period for a term of twelve (12) months, commencing on the date that immediately follows the last day of the Mini Perm Loan Period (the "**Mini Perm Loan Extension Period Commencement Date**") (the above-described period is herein call the "**Mini Perm Loan Extension Period**"), provided that Bank determines, in its sole discretion, that Borrower has timely satisfied the conditions for conversion to the Mini Perm Loan or exercise of the Mini Perm Loan Extension Period, as the case may be, set forth in subsections (c)(i) through and including (c)(vii) below (collectively, the "**Conditions for Mini Perm Loan and Mini Perm Loan Extension Periods**"), which shall be satisfied on the Mini Perm Loan Option Exercise Date or the Mini Perm Loan Extension Option Exercise Date (each as defined below) and remain satisfied as of the last day of the Construction Loan Period or the Mini Perm Loan Period, as the case may be:

(i) Borrower shall request the conversion to the Mini Perm Loan or exercise of the Mini Perm Loan Extension Period, as the case may be, in writing pursuant to the form of Mini Perm Loan/Mini Perm Loan Extension Notice attached hereto as Exhibit "A" not more than one hundred twenty (120) and not less than sixty (60) days prior to the Maturity Date or the expiration of the Mini Perm Loan Period, as applicable, which written request shall be accompanied by payment to Bank of an extension fee, for each of the Mini Perm Loan Period and the Mini Perm Loan Extension Period, equal to Fifteen Thousand Four Hundred Sixty Nine and 00/100 Dollars ($15,469.00) ("**Mini Perm Loan Fee**" and "**Mini Perm Loan Extension Fee**") (each, an "**Extension Request Notice**").

(ii) No Event of Default (as hereinafter defined) or event which, with the giving of notice or passage of time, or both, would constitute an Event of Default shall exist either on the date of Borrower's Extension Request Notice or on the date such Mini Perm Loan Period or Mini Perm Loan Extension Period commences, as applicable, and Borrower shall have so certified in writing to Bank, along with a certificate evidencing that Borrower and Guarantor (as defined in the Loan Agreement) are in

compliance with all financial covenants contained in the Loan Agreement, pursuant to the form of Borrower Compliance Certificate and Guarantor Compliance Certificate attached hereto as <u>Exhibits "B"</u> and <u>"C"</u>, respectively.

(iii) The Project is free of all liens and encumbrances, Project Stabilization has occurred, and the Project has been completed in accordance with the Plans (as defined in the Loan Agreement), as evidenced by the issuance of an unconditional certificate of occupancy for the Project pursuant to all Governmental Approvals (as defined in the Loan Agreement) by the appropriate Official Body (as defined in the Loan Agreement), in form and substance satisfactory to Bank.

(iv) Borrower shall demonstrate (i) a Project DSCR (as defined in the Loan Agreement) of not less than 1.25 to 1.00 for the Mini Perm Loan Period and (ii) a Debt Service Coverage Ratio (as defined in the Loan Agreement) of not less than 1.30 to 1.00 for the Mini Perm Loan Extension Period, each as evidenced by the delivery of Borrower's Certificate of Debt Service Coverage Ratio in the form of <u>Exhibit "C"</u>, or Borrower may make a voluntary prepayment in accordance with the terms of this Note in an amount necessary to reduce the outstanding principal balance of the Loan to the point where such Project DSCR test or Debt Service Coverage Ratio test, as applicable, is satisfied.

(v) With respect to the Mini Perm Loan Extension Period, Borrower shall demonstrate a Loan to Value of not greater than sixty five percent (65%) as substantiated by a new or updated Appraisal acceptable to Bank, or Borrower may make a voluntary prepayment in accordance with the terms of this Note in an amount necessary to reduce the outstanding principal balance of the Loan to the point where such Loan to Value test is satisfied.

(vi) With respect to the Mini Perm Loan Extension Period, the Project remains stabilized at lease rates and tenant occupancies as substantiated by a new or updated Appraisal acceptable to Bank.

(vii) Guarantor is in compliance with Guarantor's covenants for liquidity and net worth as set forth in <u>Sections 4.28</u> and <u>4.29</u> of the Loan Agreement, such compliance to be certified to Bank in the form of Guarantor's covenant compliance certificate attached as <u>Exhibit "D"</u> to the Loan Agreement.

(viii) Bank has received an endorsement to its Title Insurance Policy as described in <u>Section</u> 6.2(b) of the Loan Agreement.

(ix) The Mini Perm Loan and Mini Perm Loan Extension Periods shall be deemed an extension of this Note, and all provisions herein referring to the Note shall apply to the Mini Perm Loan and Mini Perm Loan Extension Periods.

(x) Borrower has reimbursed Bank for any costs or expenses incurred by Bank in connection with the Loan or exercise of the Mini Perm Loan Option or Mini Perm Loan Extension Option.

(d) Upon the exercise of the Mini Perm Loan Option, pursuant to the terms hereof, the "Maturity Date" shall be extended to August 28, 2023, and upon the exercise of the Mini Perm Loan Extension Option, the "Maturity Date" shall be further extended to August 28, 2024, unless accelerated upon default at an earlier date, as provided herein.

(e) If the Mini Perm Loan Option and/or the Mini Perm Loan Extension Option is exercised, then during the Mini Perm Loan Period, the Mini Perm Loan Extension Period and continuing until the extended Maturity Date, on the first (1st) day of each calendar month Borrower shall pay principal and interest in an amount equal to the then outstanding principal balance of the Loan amortized over a period

of 30 years at a hypothetical interest rate of 6%, assuming mortgage-style amortization of the principal balance. Any outstanding principal and accrued interest shall be due and payable in full on August 28, 2023 or August 28, 2024, as applicable.

(f) If any payment under this Note shall become due on a Saturday, Sunday or public holiday under the laws of the State where Bank's office indicated above is located, such payment shall be made on the next succeeding business day and such extension of time shall be included in computing interest in connection with such payment. Borrower hereby authorizes Bank to charge Borrower's deposit account at Bank for any payment when due hereunder. Payments received will be applied to charges, fees and expenses (including reasonable attorneys' fees), accrued interest and principal in any order Bank may choose, in its sole discretion.

5. **Late Payments; Default Rate.** If Borrower fails to make any payment of principal, interest or other amount coming due pursuant to the provisions of this Note within fifteen (15) calendar days of the date due and payable, Borrower also shall pay to Bank a late charge equal to the greater of five percent (5%) of the amount of such payment or One Hundred and 00/100 Dollars ($100.00) (the "**Late Charge**"). The Late Charge shall not apply to any non-delinquent payments made in satisfaction of this Loan at maturity. Such fifteen (15) day period shall not be construed in any way to extend the due date of any such payment. Upon maturity, whether by acceleration, demand or otherwise, and at Bank's option upon the occurrence of any Event of Default (as hereinafter defined) and during the continuance thereof, this Note shall bear interest at a rate per annum (based on the actual number of days that principal is outstanding over a year of three hundred sixty (360) days) which shall be three percentage points (3%) in excess of the interest rate in effect from time to time under this Note but not more than the maximum rate allowed by law (the "**Default Rate**"). The Default Rate shall continue to apply whether or not judgment shall be entered on this Note. Both the Late Charge and the Default Rate are imposed as liquidated damages for the purpose of defraying Bank's expenses incident to the handling of delinquent payments, but are in addition to, and not in lieu of, Bank's exercise of any rights and remedies hereunder, under the other Loan Documents or under applicable law, and any fees and expenses of any agents or attorneys which Bank may employ. In addition, the Default Rate reflects the increased credit risk to Bank of carrying a loan that is in default. Borrower agrees that the Late Charge and Default Rate are reasonable forecasts of just compensation for anticipated and actual harm incurred by Bank, and that the actual harm incurred by Bank cannot be estimated with certainty and without difficulty.

6. **Prepayment.** Borrower shall have the right to prepay any amount hereunder at any time and from time to time, in whole or in part; subject, however, to payment of any break funding indemnification amounts owing pursuant to Section 7 below.

7. **Increased Costs; Yield Protection.** On written demand, together with written evidence of the justification therefor, Borrower agrees to pay Bank all direct costs incurred, any losses suffered or payments made by Bank as a result of any Change in Law (hereinafter defined), imposing any reserve, deposit, allocation of capital or similar requirement (including without limitation, Regulation D of the Board of Governors of the Federal Reserve System) on Bank, its holding company or any of their respective assets relative to the Loan. "**Change in Law**" means the occurrence, after the date of this Note, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any governmental authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any governmental authority; provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory

authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

8. **Break Funding Indemnification**. Borrower agrees to indemnify Bank against any liabilities, losses or expenses (including, without limitation, loss of margin, any loss or expense sustained or incurred in liquidating or employing deposits from third parties, and any loss or expense incurred in connection with funds acquired to effect, fund or maintain any amounts hereunder (or any part thereof) bearing interest under the LIBOR Option) which Bank sustains or incurs as a consequence of either (i) Borrower's failure to make a payment on the due date thereof, (ii) Borrower's revocation (expressly, by later inconsistent notices or otherwise) in whole or in part of any notice given to Bank to request, convert, renew or prepay any amounts bearing interest under the LIBOR Option, or (iii) Borrower's payment or prepayment (whether voluntary, after acceleration of the maturity of this Note or otherwise) or conversion of any amounts bearing interest under the LIBOR Option on a day other than the regularly scheduled due date therefor. A notice as to any amounts payable pursuant to this Section given to Borrower by Bank shall, in the absence of manifest error, be conclusive and shall be payable upon demand.

9. **Other Loan Documents.** This Note is issued in connection with the Loan Agreement, the other Loan Documents (as defined in the Loan Agreement) and the other agreements and documents executed in connection therewith or referred to therein, the terms of which are incorporated herein by reference (as amended, modified or renewed from time to time, collectively the "**Loan Documents**"), and is secured by the property described in the Loan Documents (if any) and by such other collateral as previously may have been or may in the future be granted to Bank to secure this Note.

10. **Events of Default.** The occurrence of any of the following events will be deemed to be an "**Event of Default**" under this Note: (i) the occurrence of any Event of Default (as defined in the Loan Agreement), subject to applicable notice and cure period(s), if any, or (ii) Borrower's failure to perform, observe or comply with any of its agreements set forth in this Note.

Upon the occurrence of an Event of Default: (a) Bank shall be under no further obligation to make advances hereunder; (b) if an Event of Default specified in subsection 7.1(iii) of the Loan Agreement shall occur, the outstanding principal balance and accrued interest hereunder together with any additional amounts payable hereunder shall be immediately due and payable without demand or notice of any kind; (c) if any other Event of Default shall occur, the outstanding principal balance and accrued interest hereunder together with any additional amounts payable hereunder, at Bank's option and without demand or notice of any kind, may be accelerated and become immediately due and payable; (d) at Bank's option, this Note will bear interest at the Default Rate from the date of the occurrence of the Event of Default; and (e) Bank may exercise from time to time any of the rights and remedies available under the Loan Documents or under applicable law.

11. **Intentionally Omitted.**

12. **Right of Setoff.** In addition to all liens upon and rights of setoff against Borrower's money, securities or other property given to Bank by law, while any Event of Default exists Bank shall have, with respect to Borrower's obligations to Bank under this Note and to the extent permitted by law, a contractual possessory security interest in and a contractual right of setoff against, and Borrower hereby assigns, conveys, delivers, pledges and transfers to Bank all of Borrower's right, title and interest in and to, all of Borrower's deposits, moneys, securities and other property now or hereafter in the possession of or on deposit with, or in transit to, Bank or any other direct or indirect subsidiary of The PNC Financial Services Group, Inc., whether held in a general or special account or deposit, whether held jointly with someone else, or whether held for safekeeping or otherwise, excluding, however, all IRA, Keogh, and trust accounts. Every such security interest and right of setoff may be exercised without demand upon or notice to

Borrower. Every such right of setoff shall be deemed to have been exercised immediately upon the occurrence of an Event of Default hereunder without any action of Bank, although Bank may enter such setoff on its books and records at a later time.

13.     **Miscellaneous.** All notices, demands, requests, consents, approvals and other communications required or permitted hereunder ("**Notices**") must be in writing (except as may be agreed otherwise above with respect to borrowing requests) and will be effective upon receipt. Notices may be given in any manner to which the parties may separately agree, including electronic mail. Without limiting the foregoing, first class mail, facsimile transmission, commercial courier service and electronically to any electronic address provided are hereby agreed to as acceptable methods for giving Notices. Regardless of the manner in which provided, Notices may be sent to a party's address as set forth above or to such other address as any party may give to the other for such purpose in accordance with this Section. No delay or omission on Bank's part to exercise any right or power arising hereunder will impair any such right or power or be considered a waiver of any such right or power, nor will Bank's action or inaction impair any such right or power. Bank's rights and remedies hereunder are cumulative and not exclusive of any other rights or remedies which Bank may have under other agreements, at law or in equity. No modification, amendment or waiver of, or consent to any departure by Borrower from, any provision of this Note will be effective unless made in a writing signed by Bank, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Notwithstanding the foregoing, Bank may modify this Note for the purposes of completing missing content or correcting erroneous content, without the need for a written amendment, provided that Bank shall send a copy of any such modification to Borrower (which notice may be given by electronic mail). Borrower agrees to pay on demand, to the extent permitted by law, all costs and expenses incurred by Bank in the enforcement of its rights in this Note and in any security therefor, including without limitation reasonable fees and expenses of Bank's counsel. If any provision of this Note is found to be invalid by a court, all the other provisions of this Note will remain in full force and effect. Borrower and all other makers and indorsers of this Note hereby forever waive presentment, protest, notice of dishonor and notice of non-payment. Borrower also waives all defenses based on suretyship or impairment of collateral. If this Note is executed by more than one Borrower, the obligations of such persons or entities hereunder will be joint and several. This Note shall bind Borrower and its heirs, executors, administrators, successors and assigns, and the benefits hereof shall inure to the benefit of Bank and its successors and assigns; provided, however, that Borrower may not assign this Note in whole or in part without Bank's written consent and Bank at any time may assign this Note in whole or in part.

This Note has been delivered to and accepted by Bank and will be deemed to be made in the Commonwealth of Pennsylvania. THIS NOTE WILL BE INTERPRETED, AND THE RIGHTS AND LIABILITIES OF BANK AND BORROWER DETERMINED IN ACCORDANCE WITH, THE LAWS OF THE COMMONWEALTH OF PENNSYLVANIA, EXCLUDING ITS CONFLICT OF LAWS RULES. Borrower hereby irrevocably consents to the exclusive jurisdiction of any state court sitting in Allegheny County, Pennsylvania, or any federal court sitting in the Western District of Pennsylvania; provided that nothing contained in this Note will prevent Bank from bringing any action, enforcing any award or judgment or exercising any rights against Borrower individually, against any security or against any property of Borrower within any other county, state or other foreign or domestic jurisdiction. Borrower acknowledges and agrees that the venue provided above is the most convenient forum for both Bank and Borrower. Borrower waives any objection to venue and any objection based on a more convenient forum in any action instituted under this Note.

14.     **Anti-Money Laundering/International Trade Law Compliance.** Borrower represents and warrants to Bank, and covenants and agrees, as of the date of this Note, the date of each advance of proceeds under the Loan, the date of any renewal, extension or modification of the Loan, and at all times until the Loan has been terminated and all amounts thereunder have been indefeasibly paid in full, that: (A) no Covered Entity is a Sanctioned Person, (B) no Covered Entity, either in its own right or through any third

{00618809.9}                                              - 8 -

party (i) has any of its assets in a Sanctioned Country or in the possession, custody or control of a Sanctioned Person in violation of any Anti-Terrorism Law; (ii) does business in or with, or derives any of its income from investments in or transactions with, any Sanctioned Country or Sanctioned Person in violation of any Anti-Terrorism Law; or (iii) engages in any dealings or transactions prohibited by any Anti-Terrorism Law, (C) no Covered Entity will become a Sanctioned Person, (D) no Covered Entity, either in its own right or through any third party, will (a) have any of its assets in a Sanctioned Country or in the possession, custody or control of a Sanctioned Person in violation of any Anti-Terrorism Law; (b) do business in or with, or derive any of its income from investments in or transactions with, any Sanctioned Country or Sanctioned Person in violation of any Anti-Terrorism Law; (c) engage in any dealings or transactions prohibited by any Anti-Terrorism Law or (d) use the Advances to fund any operations in, finance any investments or activities in, or, make any payments to, a Sanctioned Country or Sanctioned Person in violation of any Anti-Terrorism Law.  The funds used to repay the Loan will not be derived from any unlawful activity.  Each Covered Entity shall comply with all Anti-Terrorism Laws.  Borrower shall promptly notify Bank in writing upon the occurrence of a Reportable Compliance Event.

As used herein: "**Anti-Terrorism Laws**" shall mean any Laws relating to terrorism, trade sanctions programs and embargoes, import/export licensing, money laundering or bribery, and any regulation, order, or directive promulgated, issued or enforced pursuant to such Laws, all as amended, supplemented or replaced from time to time.  "**Collateral**" shall mean any and all collateral now or hereafter serving as collateral for the Loan. "**Covered Entity**" shall mean (a) each Borrower, each of Borrower's Subsidiaries, all Guarantors and all pledgors of Collateral and (b) each Person that, directly or indirectly, is in control of a Person described in clause (a) above.  For purposes of this definition, control of a Person shall mean the direct or indirect (x) ownership of, or power to vote, 25% or more of the issued and outstanding equity interests having ordinary voting power for the election of directors of such Person or other Persons performing similar functions for such Person, or (y) power to direct or cause the direction of the management and policies of such Person whether by ownership of equity interests, contract or otherwise. "**Governmental Body**" shall mean any nation or government, any state or other political subdivision thereof or any entity, authority, agency, division or department exercising the executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to a government (including any supra-national bodies such as the European Union or the European Central Bank) and any group or body charged with setting financial accounting or regulatory capital rules or standards (including, without limitation, the Financial Accounting Standards Board, Bank for International Settlements or the Basel Committee on Banking Supervision or any successor or similar authority to any of the foregoing). "**Law**" shall mean any law(s) (including common law), constitution, statute, treaty, regulation, rule, ordinance, opinion, issued guidance, release, ruling, order, executive order, injunction, writ, decree, bond, judgment, authorization or approval, lien or award of or any settlement arrangement, by agreement, consent or otherwise, with any Governmental Body, foreign or domestic. "**Person**" shall mean any individual, corporation, partnership, limited liability company, association, joint-stock company, trust, unincorporated organization, joint venture, government or political subdivision or agency thereof, or any other entity. "**Reportable Compliance Event**" shall mean that any Covered Entity becomes a Sanctioned Person, or is charged by indictment, criminal complaint or similar charging instrument, arraigned, or custodially detained in connection with any Anti-Terrorism Law or any predicate crime to any Anti-Terrorism Law, or has knowledge of facts or circumstances to the effect that it is reasonably likely that any aspect of its operations is in actual or probable violation of any Anti-Terrorism Law. "**Sanctioned Country**" shall mean a country subject to a sanctions program maintained under any Anti-Terrorism Law. "**Sanctioned Person**" shall mean any individual person, group, regime, entity or thing listed or otherwise recognized as a specially designated, prohibited, sanctioned or debarred person, group, regime, entity or thing, or subject to any limitations or prohibitions (including but not limited to the blocking of property or rejection of transactions), under any Anti-Terrorism Law. "**Subsidiary**" of any Person at any time shall mean: (i) any corporation or trust of which 50% or more (by number of shares or number of votes) of the outstanding capital stock or shares of beneficial interest normally entitled to vote for the election of one or more directors or trustees

(regardless of any contingency which does or may suspend or dilute the voting rights) is at such time owned directly or indirectly by such Person or one or more of such Person's Subsidiaries, (ii) any partnership of which such Person is a general partner or of which 50% or more of the partnership interests is at the time directly or indirectly owned by such Person or one or more of such Person's Subsidiaries, (iii) any limited liability company of which such Person is a sole member or a sole managing member or of which 50% or more of the limited liability company interests is at the time directly or indirectly owned by such Person or one or more of such Person's Subsidiaries or (iv) any corporation, trust, partnership, limited liability company or other entity which is controlled or capable of being controlled by such Person or one or more of such Person's Subsidiaries.

15.     **Indemnity**. Borrower agrees to indemnify each of Bank, each legal entity, if any, who controls, is controlled by or is under common control with Bank, and each of their respective directors, officers and employees (the "**Indemnified Parties**"), and to defend and hold each Indemnified Party harmless from and against any and all claims, damages, losses, liabilities and expenses (including all fees and charges of internal or external counsel with whom any Indemnified Party may consult and all expenses of litigation and preparation therefor) which any Indemnified Party may incur or which may be asserted against any Indemnified Party by any person, entity or governmental authority (including any person or entity claiming derivatively on behalf of Borrower), in connection with or arising out of or relating to the matters referred to in this Note or in the other Loan Documents or the use of any advance hereunder, whether (a) arising from or incurred in connection with any breach of a representation, warranty or covenant by Borrower, or (b) arising out of or resulting from any suit, action, claim, proceeding or governmental investigation, pending or threatened, whether based on statute, regulation or order, or tort, or contract or otherwise, before any court or governmental authority,; provided, however, that the foregoing indemnity agreement shall not apply to any claims, damages, losses, liabilities and expenses solely attributable to the Bank's gross negligence or willful misconduct.  The indemnity agreement contained in this Section shall survive the termination of this Note, payment of any amounts hereunder and the assignment of any rights hereunder. Borrower may participate at its expense in the defense of any such action or claim.

16.     **Electronic Signatures and Records**.  Notwithstanding any other provision herein, Borrower agrees that this Note, the Loan Documents, any amendments thereto, and any other information, notice, signature card, agreement or authorization related thereto (each, a "**Communication**") may, at Bank's option, be in the form of an electronic record.  Any Communication may, at Bank's option, be signed or executed using electronic signatures.  For the avoidance of doubt, the authorization under this Section may include, without limitation, use or acceptance by Bank of a manually signed paper Communication which has been converted into electronic form (such as scanned into PDF format) for transmission, delivery and/or retention.

17.     **Commercial Purpose.**  Borrower represents that the indebtedness evidenced by this Note is being incurred by Borrower solely for the purpose of acquiring or carrying on a business, professional or commercial activity, and not for personal, family or household purposes.

18.     **USA PATRIOT Act Notice**.  To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify and record information that identifies each Borrower that opens an account.  What this means: when Borrower opens an account, Bank will ask for the business name, business address, taxpayer identifying number and other information that will allow Bank to identify Borrower, such as organizational documents.  For some businesses and organizations, Bank may also need to ask for identifying information and documentation relating to certain individuals associated with the business or organization.

19.     **Authorization to Obtain Credit Reports.**  By signing below, each Borrower who is an individual provides written authorization to Bank or its designee (and any assignee or potential assignee hereof) to

obtain Borrower's personal credit profile from one or more national credit bureaus. Such authorization shall extend to obtaining a credit profile in considering this Note and subsequently for the purposes of update, renewal or extension of such credit or additional credit and for reviewing or collecting the resulting account.

20.     **Acknowledgment.** **Whenever any provision of this Note or any other Loan Document appoints Bank or its agents, attorneys or employees as attorney-in-fact or agent for Borrower, the parties hereto acknowledge that such appointment is irrevocably made for the benefit of Bank as additional security for the repayment of the Loan. Borrower specifically authorizes and directs any such attorney-in-fact or agent to exercise the powers granted or delegated to it herein or in any other Loan Document solely for the benefit of Bank and not for the benefit of Borrower.**

21.     **WAIVER OF JURY TRIAL. BORROWER IRREVOCABLY WAIVES ANY AND ALL RIGHTS BORROWER MAY HAVE TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR CLAIM OF ANY NATURE RELATING TO THIS NOTE, ANY DOCUMENTS EXECUTED IN CONNECTION WITH THIS NOTE OR ANY TRANSACTION CONTEMPLATED IN ANY OF SUCH DOCUMENTS. BORROWER ACKNOWLEDGES THAT THE FOREGOING WAIVER IS KNOWING AND VOLUNTARY.**

**Borrower acknowledges that it has read and understood all the provisions of this Note, including the waiver of jury trial, and has been advised by counsel as necessary or appropriate.**

*[Remainder of Page Left Intentionally Blank]*

**WITNESS** the due execution hereof as a document under seal, as of the date first written above to be effect on the Effective Date, with the intent to be legally bound hereby.

RM63 HOLDINGS, LLC, a Delaware limited liability company

By: _____
Kenneth M. Franasiak, Manager

STATE OF NEW YORK        )
                         )  SS:
COUNTY OF NIAGARA        )

The instrument was acknowledged before me this 7TH day of August, 2019 by Kenneth M. Franasiak, the Manager of RM63 HOLDINGS, LLC, a Delaware limited liability company, on behalf of the company.

_____
Notary Public

My Commission Expires:
June 25, 2022

SUZANNE R MURRAY
Notary Public - State of New York
NO. 01MU6377159
Qualified in Erie County
My Commission Expires Jun 25, 2022

*[Signature Page of Deed of Trust Note]*

{00618809.9}                                12

**EXHIBIT "A"**

**FORM OF MINI PERM LOAN/MINI PERM LOAN EXTENSION NOTICE**

To: PNC Bank, National Association        Borrower: RM63 HOLDINGS, LLC
The Tower at PNC Plaza
300 Fifth Avenue, 19th Floor             Loan No.:_____
PT-PTWR-15-1
Pittsburgh, PA 15222
Attn: Vice President – Real Estate Banking

With regard to the referenced loan (the "**Loan**"), the undersigned hereby requests that you [**select one of the following:** convert the Construction Loan to a Mini Perm Loan beginning on August 28**, 2022/** extend the term of the Mini Perm Loan beginning on August 28**, 2023**] pursuant to the provisions of the Construction and Mini Perm Loan Agreement (as amended from time to time, the "**Loan Agreement**") dated August ___, 2019, and effective as of August 28, 2019, between **RM63 HOLDINGS, LLC**, a Delaware limited liability company (the "**Borrower**") and **PNC BANK, NATIONAL ASSOCIATION** (the "**Bank**"). The Loan is evidenced by that certain Deed of Trust Note dated August __, 2019, in the aggregate face amount of $12,375,000.00, and the other loan documents defined in the Loan Agreement (collectively, the "**Loan Documents**").

  The undersigned agrees to execute whatever additional documents (including a mutually acceptable extension agreement) which may be required in order to implement or to clarify the terms of the [**select one of the following:** conversion to the Mini Perm Loan / extension of the Mini Perm Loan Option] or to preserve and maintain the security granted in connection with the Loan.

  The undersigned hereby certifies that the [**select one of the following:** Conditions for Mini Perm Loan Period / Conditions for Mini Perm Loan Extension Period] (as defined in the Note) have been satisfied. Set forth on Borrower's Certificate of Debt Service Coverage Ratio attached hereto are calculations of Borrower's compliance with the [**select one of the following**: Project DSCR set forth in the Conditions for Mini Perm Loan/the Debt Service Coverage Ratio set forth in the Conditions for Mini Perm Loan Extension Period]. Set forth on Guarantor[s'] Compliance Certificate attached hereto are calculations of Guarantor[s'] compliance with Guarantor's covenants as required in Sections 4.28 and 4.29 of the Loan Agreement which is set forth in the [**select one of the following:** Conditions for Mini Perm Loan / Conditions for Mini Perm Loan Extension Period].

  Pursuant to the terms of the Loan Agreement, enclosed is the [**select one of the following:** Mini Perm Loan Fee / Mini Perm Loan Extension Fee] in the amount of $15,468.75.

  The undersigned further agrees that no further advances of the Loan shall be available after the Mini Perm Loan Commencement Date.

Dated: _____        RM63 HOLDINGS, LLC, a Delaware limited liability company

              By: _____
                 Kenneth M. Franasiak, Manager

A-2

Guarantor hereby acknowledges his continued liability pursuant to his certain Guaranty (as defined in the Construction and Mini Perm Loan Agreement), and that such liability shall remain unaffected by the above extension of the Loan.

_____  _____

Kenneth M. Franasiak, an individual

**EXHIBIT "B"**

**FORM OF BORROWER COMPLIANCE CERTIFICATE**

_____, 20\_\_\_\_

| | |
|---|---|
| PNC Bank, National Association<br>The Tower at PNC Plaza<br>300 Fifth Avenue, 19th Floor<br>PT-PTWR-15-1<br>Pittsburgh, PA  15222<br>Attn:  Vice President – Real Estate Banking | Borrower:  RM63 HOLDINGS, LLC<br><br>Loan No.:_____ |

Ladies and Gentlemen:

I refer to that certain Construction and Mini Perm Loan Agreement, dated August \_\_\_, 2019 and effective as of August 28, 2019 (as amended, restated, supplemented or modified from time to time, the "**Loan Agreement**") between RM63 Holdings, LLC, a Delaware limited liability company ("**Borrower**") and PNC Bank, National Association, a national banking association ("**Bank**").  Unless otherwise defined herein, terms defined in the Loan Agreement are used herein with the same meanings.  Pursuant to Section 4.7 of the Loan Agreement, Borrower hereby certifies as of [_____, 20\_\_] (the "**Report Date**") that:

(1) I have attached information, financial statements and other financial data pursuant to Sections 4.8, 4.9 and 4.10 and Exhibit "C" of the Loan Agreement (the "**Statements**").  The Statements are true and correct in all respects and present fairly the financial condition of Borrower.  All other information given to Bank by or with respect to Borrower is accurate, correct and complete in all respects.  Borrower has no liabilities, contingent or otherwise, or forward or long-term commitments that are not disclosed in the Statements, and except as disclosed therein there are no unrealized or anticipated losses from any commitments of Borrower which may cause a material adverse effect.

(2) The Statements include calculations substantiating compliance as of the Report Date with all financial covenants contained in Sections 4.28 and 4.29 and Exhibit "C" of the Loan Agreement.

(3) Borrower has performed and complied with all covenants and conditions contained in the Loan Documents.

(4) No Event of Default nor any event which, with the giving of notice, the passage of time, or both, would constitute an Event of Default has occurred and is continuing or exists under any Loan Document.

(5) All representations and warranties of Borrower contained in Article 3 of the Loan Agreement are true and correct on the date hereof with the same effect as though such representations and warranties had been made on and as of today (except representations and warranties which expressly relate solely to an earlier date or time).

   I have executed and delivered this Certificate with the understanding that Bank will rely hereon pursuant to the terms of the Loan Documents.

                <u>BORROWER</u>:

                RM63 HOLDINGS, LLC, a Delaware limited liability company

                By:_____
                   Kenneth M. Franasiak, Manager

**EXHIBIT "C"**

**FORM OF CERTIFICATE OF DEBT SERVICE COVERAGE RATIO**

_____, 20\_\_\_

PNC Bank, National Association                                     Borrower:  RM63 HOLDINGS, LLC
The Tower at PNC Plaza
300 Fifth Avenue, 19th Floor                                          Loan No.:_____
PT-PTWR-15-1
Pittsburgh, PA  15222
Attn:  Vice President – Real Estate Banking

Ladies and Gentlemen:

I refer to the Construction and Mini Perm Loan Agreement, dated August \_\_\_, 2019 and effective as of August 28, 2019, by and between RM63 Holdings, LLC, a Delaware limited liability company ("**Borrower**") and PNC Bank, National Association, a national banking association ("**Bank**") (as amended, restated, supplemented or modified from time to time, the "**Loan Agreement**").

I, _____, the _____ of Borrower, do hereby certify on behalf of Borrower as of the [_____, **20\_\_**] (the "**Report Date**"), as follows:

Attached hereto are calculations substantiating that as of [DATE], the debt service coverage ratio with respect to the Project is _____ which is greater than or equal to [the required Project DSCR of 1.25 to 1.00 for the Mini Perm Loan Period or the required Debt Service Coverage Ratio of 1.30 to 1.00 for the Mini Perm Loan Extension Period].

All capitalized terms used herein shall have the meanings ascribed thereto in the Loan Agreement. The undersigned has executed and delivered this Certificate on behalf of Borrower with the understanding that Bank will rely hereon pursuant to the terms of the Loan Agreement.

{00618809.9}                                                C-1